Bessie Farrow, Appellant-Petitioner,

*v.*

James Hopkins dba et al., Appellee-Defendant.

453 S.W.2d 785.

(*Jackson,* April Term, 1969.)

Opinion filed March 2, 1970.

Ira H. Murphy, Memphis, for appellant.

Robert M. Fargarson, Neely, Green & Fargarson, Memphis, of counsel, for appellee.

Mr. Special Justice Jenkins delivered the opinion of the Court.

This is a workmen's compensation case which was brought in the Chancery Court of Shelby County, Tennessee, by Bessie Farrow, as complainant or petitioner against the defendants, James Hopkins d/b/a Hopkins Garage, and United States Fidelity & Guaranty Company.

The petitioner who was the widow of the deceased employee, Tommy Farrow, the appellant here, sued to obtain death benefits under the Workmen's Compensation Act.

The defendant employer, while admitting that Bessie Farrow was the widow of Tommy Farrow, the deceased employee, denied that she was entitled to such benefits under the said Act because she was voluntarily living apart from her husband at the time of his death, and was not dependent upon him for support.

That part of the Workmen's Compensation Act under which the widow claims benefits is T.C.A. Section 50-1013,

"Dependents—Compensation Payments.—(a) Persons wholly dependent. For the purposes of the Workmen's

Compensation Law the following described persons shall be conclusively presumed to be wholly dependent: (1) A wife, unless it be shown that she was voluntarily living apart from her husband at the time of his injury, and minor children under the age of sixteen (16) years.''

The Chancellor after hearing the proof in the case held that the widow, Bessie Farrow, was not entitled to benefits as the dependent widow of the deceased under the Workmen's Compensation Act and dismissed her petition and from this decision the widow has appealed to this Court.

The question before the Court is whether or not the petitioner, Bessie Farrow, was the dependent widow of the deceased employee, Tommy Farrow, or was she voluntarily living apart from the worker at the time of his death and not dependent upon him for support.

Bessie Farrow and Tommy Farrow were married on June 8, 1935. The record is cloudy as to exactly why and when the parties separated, but the separation occurred sometime after the employee returned from the Army in 1943. They had no children. They never lived together after they separated and apparently had no contact with each other, physical or otherwise.

The employee, Tommy Farrow, was killed while working on the job for the employer on April 17, 1967.

At the time of his death, Tommy Farrow was living with one Lillie Mae Farrow as man and wife, with whom he had lived for more than twenty years without the formality or benefit of a divorce or the ceremony of marriage. Seemingly, they agreed in the old proverb that ''With marriage begins the sunset of love.''

When Lillie Mae and the deceased started living together the employee had separated from the widow-petitioner, and at one time had dated a girl by the name of Lizzie Mae Hogg, a married woman, but this was apparently a passing fancy, because when he started living with Lillie Mae it was for good. He was a one-woman man.

He did not know Lillie Mae until after he and Bessie parted. The first time Lillie Mae ever saw Tommy Farrow was "in town" shortly after his return from the war "with his soldier suit on."

They went together for awhile and then set up housekeeping in Covington "in a place called Black Bottom" and held themselves out to the public as man and wife, and were living as man and wife when as Lillie Mae testified "he passed." The employee had reached that enviable estate in life where he was king of his household. "He is the happiest, be he king or peasant, who finds peace in his home." Lillie Mae testified that she always "let the man do the thinking," and deferred to his judgment in all matters.

After Tommy and Bessie separated, he had lived with an Aunt Mattie before taking up residence with Lillie Mae, and Bessie Farrow, the petitioner knew of her husband living with Lillie Mae as man and wife. Bessie never complained and never sought a divorce or asked him for support. Both she and the deceased did not need a divorce for they got along pretty well without one.

Shortly before or after Bessie and Tommy separated Bessie, according to testimony of Lillie Mae, had a baby by one Clive Jones. She denied this, but in January of 1945, Bessie Farrow was visited with a blessed event,

giving birth to a boy child, Lawrence Culbreath. She made no claim that the child belonged to Tommy, but said that it belonged to "a friend," Emmett Culbreath. The petitioner apparently limited her favors to "friends."

From 1960 to 1966, the petitioner went by the name of Bessie Cannon, living in the home of Joe Cannon and helping look after Cannon's mother who died in 1962. She lived on in the home of Joe Cannon for four years after his mother's death, went by his name, but testified that it was not what it looked like; that she was not living with him as man and wife. This statement is subject to question, the Court still having a keen and vivid imagination where the facts of life are concerned.

Be that as it may, the petitioner never at any time claimed support or was supported by the deceased employee. They had gone their separate ways and so far as the record reveals were both happy.

At the time of the filing of the suit the widow was living in Memphis under her maiden name, Bessie Smith. It seems she changed names easily, and it is significant that she rarely, if ever, used the name Farrow other than in bringing this lawsuit.

The widow-petitioner testified that she was willing to forgive the deceased Farrow for his transgressions and take him back. We do not think she was in any position, in view of her conduct, to stand in the shoes of a "forgiver."

The petitioner relies heavily on the case of *Cole v. Bemis Brothers Bag Company,* 215 Tenn. 259, 385 S.W.2d 103, decided by the late Justice Weldon White, a great humanitarian and a keen student of human nature whose

decisions will long stand as a monument to his service on this Court. However, the facts decided by Justice White in the case above are not analogous to the present case. In that case, the widow and the worker were still on "praying grounds and pleading terms," whereas in the case at Bar love had perished, never to bloom again and not a spark remained on which to rekindle the lost flame. They had both basked in the smiles of others and enjoyed their favors.

In the Cole case, supra, the petitioner, as women ofttimes will, became jealous of a Louise Bell, and at times became quarrelsome and even downright truculent, and left her husband and moved to Jackson, Tennessee. Strange to say, in that case the dispute about Louise Bell was the only trouble they had ever had. She just did not like Louise. But the spark of love between them had not died. They would visit together in their respective homes, sleep together, and discussed reconciliation from time to time, even as recent as three weeks before his death. The complainant, in that case, would not live in the same community with Louise Bell, for "foul whisperings are abroad." The Chancellor and the Supreme Court held that she had "grounds" for not returning to live with him and that she was not voluntarily living apart at the time of his death. There is no suggestion of any misconduct on the part of the widow in that case.

The petitioner also relies on *Partee v. Memphis Concrete Pipe Co.,* 155 Tenn. 441, 295 S.W. 68, decided by this Court in December of 1926. In the Partee case, the husband and wife had what she called a "little squabble" because of some gossip she had heard about him. She testified "I got after him about it, and he got mad, and that is what the little squabble between him and I came

up about." They would have a little "squabble" from time to time, and her husband would leave and come back, for the widow testified "I never had any dreams of him going away from me to never come back. * * * When he left there, he was no more mad at me than nothing in the world * * *. And he says, 'Well, I am going, beings that you will just listen to what my folks say.' He says, 'I am going.' He says, 'You will miss me when I am gone.' I said, 'Yes, I am satisfied I will miss you when you are gone.' I said, 'Arthur, there is no need your acting like this.' * * * And he said, 'Well, I am going.' " And he went. The gossip some perhaps unfounded, was real to her, for "Trifles light as air are, to the jealous, confirmations strong as proofs of holy writ."

The Supreme Court in that case held that "The petitioner did not desert her husband, and committed no act to justify his desertion of her. She remained at home, expecting him to return, and willing for him to do so. She could have enforced the wife's claim to support, because the legal and moral obligation rested upon him."

The employer relies on *Wright et al. v. Armstrong et al.*, 179 Tenn. 134, 163 S.W.2d 78. In this case the widow sued for compensation under the Workmen's Compensation Act. She and her husband had separated but she had entered into a second marriage which was without the benefit of divorce, said marriage of course being bigamous, and testified that while she knew she was not divorced from Arthur Armstrong, her husband, that she married this second man, "because I needed somebody to kind of help me support myself. I just got tired of working." The Supreme Court held in this case as follows: "Under these uncontroverted facts was petitioner

voluntarily living apart from her husband at the time of his death? We think she was. * * * the fact is uncontroverted that she wilfully entered into the bigamous marriage with Frank Gray in 1935, lived with and was supported by him until the death of her husband and was still living with him at the time of the trial of this case and during all that time she made no effort to return to Arthur Armstrong. Regardless of the cause of her separation from Arthur Armstrong she was certainly living apart from him voluntarily 'at the time of his injury' and there is no evidence to the contrary. Melvina Armstrong cannot recover for herself.''

We think that the Wright case, supra, is controlling in this case. We do not believe that the deceased, Tommy Farrow, was the cause of the separation of the parties, but assuming for the sake of argument that the deceased caused the separation, petitioner quickly found solace for her sorrows with another or others.

As a matter of fact, each party found happiness with others and had apparently forgotten their marriage vows with all the obligations thereof. The deceased did not support the wife. She asked no support nor expected any. The separation was over a long period of time. They saw each other occasionally but never discussed the separation or a reconciliation, and we agree with the learned Chancellor that when Bessie testified that she was willing to resume the relationship with her husband and was not living apart voluntarily, as expressed in his opinion, ''We can't accept that theory. I cannot conceive of individuals who can live separate and apart for some 20 or more years, and whether it be voluntary or involuntary at its commencement, certainly thereafter,

there can develop a situation whereby sheer acquiescence alone can become of the nature and character of being voluntary * * *. One of the definitions, I would say, of voluntary is willingness, willing, or act of the will. And surely, in this case, the relationship—the separation of the parties * * * was a willing act on their part. He was living with Lillie Mae, and she was living with her mother.''

We, therefore, agree with the Chancellor that the petitioner-widow is not entitled to workmen's compensation. There is no need to deal with the ''material evidence'' rule to support the finding of the Chancery Court in this case for the evidence shows conclusively that the widow was living voluntarily separate and apart from her husband, the deceased, and was not being supported by him, and we therefore affirm the ruling of the Chancellor, and the costs of the cause are taxed against the petitioner, Bessie Farrow, and the sureties on her bond.

DYER, CHIEF JUSTICE, CRESON, and McCANLESS, JUSTICES, and BOZEMAN, SPECIAL JUSTICE, concur.